***********
The undersigned reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Stanback. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; and having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Stanback with modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The employee is Tom Bowen
2. The employer is Carolina Freight.
3. The employer was self-insured at the time of the injury by accident through Reliance.
4. The defendant-employer regularly employs three or more employees and is bound by the N.C. Workers' Compensation Act. The employer-employee relationship existed between the employer and employee on or about February 2, 1995, the date and time of the accident.
5. Plaintiff's average weekly wage is $556.62. The compensation rate is $371.08 per the Form 21 approved on March 29, 1995. The plaintiff receives $742.16 biweekly.
6. Plaintiff's claim is for an injury to the back.
7. Documents stipulated into evidence include the following:
a. Stipulated Exhibit #1: Plaintiff's medical records
b. Stipulated Exhibit #2: Medical records from Jones Family Practice and Dr. Thomas Kean
c. Stipulated Exhibit #3: Industrial Commission Forms and records from the Form 24 Proceedings
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 57 years of age and had completed the seventh grade. He has not pursued or earned a GED or its equivalent. The plaintiff can read but has problems comprehending the subject matter. Plaintiff also has difficulty with mathematics.
2. Plaintiff was employed as a dockworker for Carolina Freight in 1981 when he injured his lower back in a non-work related injury. Dr. Jennings performed surgery, removing the disc at L5-S1, and plaintiff was out of work for nine months.
3. After reaching maximum medical improvement, plaintiff was advised not to return to the heavy dock work as it increased his risk of re-injury. However, plaintiff, knowing only that type of work, returned to his regular employment at Carolina Freight. He was never given a disability rating for this injury.
4. Plaintiff continued to work in that particular field until February 2, 1995. While lifting pieces of furniture, plaintiff felt a sharp burning pain in his right hip that radiated from the groin to the thigh and down the leg. The claim was accepted as compensable by the defendants on a Form 21 Agreement.
5. Plaintiff treated with Dr. John DePerczel from February 9, 1995 until April 28, 1995. Diagnosing a right strain with right sciatica, Dr. DePerczel returned plaintiff to light duty work and no lifting over twenty-five pounds. No light work was available and Dr. DePerczel opined that plaintiff should have a structured exercise program. Defendants requested a second opinion with Dr. Peters. A review of the x-rays revealed degenerative disc disease at L5-S1. Dr. Peters advised that plaintiff could return to full employment with no restrictions.
6. After attempting regular duty work for several hours, plaintiff returned home in pain. Dr. Peters then recommended light duty work for two weeks. After two weeks, pain continued to radiate down plaintiff's right leg, flexion of the back was limited, and straight leg raising was reduced.
7. Dr. De Perczel, as well as the rehabilitation nurse, Robin Hartman, felt that continued light duty work was necessary. Subsequently, an MRI was performed that indicated a right paracentral soft disc herniation with inferior migration at L3-4. Conservative treatment was recommended; but if the pain continued, plaintiff was to be considered a candidate for surgical removal of the disc.
8. The MRI revealed that plaintiff had a large disc herniation at L3-4, which displaced the spinal cord and the nerve root. At the L5-S1, the site of the previous surgery in 1981, there was a bulging disc that displaced the nerve root.
9. Defendant requested a second opinion with Dr. Garland who reviewed the x-rays, the MRI and examined the plaintiff. Dr. Garland opined that plaintiff could return to regular employment. Before returning to work, plaintiff had a recurrence of pain and a nerve block was suggested. Plaintiff was taken out of work, and a second MRI was performed. Its findings indicated degenerative changes throughout the spine. Disc herniation of the L3-4 was also noted.
10. Dr. Garland performed a hemilaminectomy and microdiskectomy at L3-4 on August 10, 1995. There was initial complete relief of pain following the surgery; however, after several days, plaintiff presented with severe leg pain. Dr. Garland gave plaintiff the option of returning to surgery to see if the disc had re-herniated or to wait a few days.
11. A follow up MRI revealed that the L3-4 disc had re-herniated. Dr. Garland felt that further surgical intervention would cause more problems such as irritation to the already inflamed area and more scar tissue. Dr. Garland utilized conservative treatment of medication and physical therapy to manage the disc. A functional capacity evaluation was performed, and plaintiff entered a work hardening program. Upon completion of the work hardening program, plaintiff was evaluated as being able to perform medium work. Dr. Garland opined that his work as dockworker was close enough that he should return to his old employment. A second opinion with Dr. Wood was recommended. Despite continued complaints of leg pain, Dr. Garland did not recommend surgical intervention. Plaintiff remained out of work.
12. Dr. Wood followed plaintiff and continued to monitor his pain level. Films, MRI reports, scans and other reports were reviewed. A CT mylogram revealed recurrent disc herniation at L3-4. Dr. Wood performed a laminectomy and foraminotomy at L3-4 on April 29, 1996. Dr. Wood followed the plaintiff subsequent to the surgery, including initiating a work hardening program.
13. Plaintiff continued to suffer from persistent pain, so Dr. Wood requested that a discogram be performed on October 29, 1996. At that point, Dr. Wood recommended a decompressive laminectomy at L3-4 and L4-5 with a fusion at L3 to L5. Dr. Wood further opined that plaintiff would not be able to return to work loading heavy freight with the defendant. Dr. Wood also requested a second opinion with Dr. Hicks. By this time, plaintiff had been out of work for approximately two years.
14. Upon examination with Dr. Hicks, plaintiff reported that the pain he endured was 75% leg pain and 25% back pain. His pain was getting worse, especially upon lifting. Plaintiff only received relief from pain when lying down, and his pain increased as the day progressed. Dr. Hicks noted that plaintiff's general lifestyle had deteriorated greatly over the past two years. Plaintiff and his wife were incapable of doing the things they formerly enjoyed. If they tried to go out, they had to return home due to plaintiff's pain level. As treatment for his pain, Dr. Hicks performed a microdecompressive laminectomy at L3-4 and L4-5 with a posterolateral fusion with right iliac crest bone graft and Steffee instrumentation.
15. On January 6, 1998, Dr. Hicks opined that plaintiff had reached maximum medical improvement and assigned a disability rating of 25% of the back. A functional capacity evaluation was requested, the results of which revealed that plaintiff could perform sedentary work. Defendant therefore began vocational rehabilitative efforts to assist plaintiff in finding sedentary work.
16. The first vocational counselor was Omega Autry. Subsequent to a medical leave of absence, Ms. Autry was replaced by another counselor, Priscilla Styers. Plaintiff, who had not worked in more than two years, began to suffer from depression in association with his chronic back pain, and due to the demanding nature of the vocational rehabilitation assignments given him by Ms. Styers, who was more assertive and more aggressive than Ms. Autry. Plaintiff cooperated with vocational rehabilitation efforts to the best of his ability, considering his limited education, persistent and disabling back pain, and his depression. Ms. Styers insisted that the only way plaintiff could obtain a job was to get his GED, the pursuit of which made plaintiff very uncomfortable, considering his historical lack of success during his grade school education. Plaintiff could not bear the stress created by attending the GED classes and feared humiliation in the event that he failed them.
17. As a part of his vocational rehabilitation program an APTICOM test was administered to plaintiff. The results indicated that plaintiff scored below average in general learning ability, form perception and well below average in clerical perception, manual dexterity, verbal aptitude, eye-hand-foot coordination, and motor coordination. Overall, plaintiff was found to have language skills at the third grade level and math skills below third grade level. Paintiff does not possess the cognitive and reasoning ability to adapt to new work settings with little difficulty, and he does not possess any other transferable vocational skills, having worked the previous fifteen years loading heavy freight on a dock.
18. Most of the jobs located by vocational counselors assigned to plaintiff's claim were part-time positions, beyond plaintiff's education or that required a GED. A security guard position was located for plaintiff; however, the job required ten years of education, which the plaintiff lacked, and it was never approved by a physician. The security job position was not suitable employment, and the plaintiff did not unjustifiably refuse such employment.
19. Plaintiff began to suffer from symptoms of depression, adjustment disorder and suicidal ideations subsequent to the vocational efforts of Priscilla Styers. Correspondence dated April 12, 2000 from Dr. Stephen Jones, plaintiff's family physician, canceled vocational efforts until an evaluation by a psychiatrist.
20. Dr. Thomas McKean, psychiatrist, first saw the plaintiff on April 17, 2000, for suicidal thoughts and depression due to chronic pain and vocational efforts. Plaintiff's family history is positive for two family members committing suicide. Dr. McKean opined that vocational rehabilitative efforts were one of the major stressors that led to the plaintiff's clinical depression. Vocational rehabilitation continued to be an issue in plaintiff's life during the course of Dr. McKean's discussions with plaintiff. Dr. McKean's psychiatric treatment was necessary to effect a cure of provide relief or plaintiff's depressive symptoms.
21. Dr. McKean concluded that plaintiff could not do abstract thinking because his education level is to the point that he cannot perform those functions. On exam, plaintiff's IQ was below normal and his concentration and memory were impaired. In Dr. McKean's opinion, from a clinical perspective, plaintiff suffered from a learning disability and had borderline mental functioning. He requested that additional psychological tests be performed, but the carrier would not approve the same. Dr. McKean opined that plaintiff could "not work secondary to his physical and mental issues." After counseling plaintiff for eight months, Dr. McKean opined that because of plaintiff's depressive issues, chronic pain issues, learning disability and borderline mental functioning, plaintiff would not be able to obtain his GED based upon his mental issues. Dr. McKean further noted that pursuing a GED was not appropriate for plaintiff as it was a stressor that caused him major depression.
22. Despite his chronic back pain and mental issues, plaintiff cooperated with vocational rehabilitative efforts. Paintiff attended all vocational meetings, took a placement test for the GED, sought employment on his own by reviewing advertisements for work in the Shelby area and speaking to colleagues, completed sample job applications, got a criminal background check and paid for the same, completed job lead forms to the best of his ability, went to the Employment Security Commission to locate jobs and scheduled and attended the only job interview that the vocational counselor suggested.
23. Paintiff was unable to keep current with the number of job leads requested of him by Ms. Styers. When plaintiff turned in less than what had been requested, Ms. Styers would give new assignments for job leads, creating a burdensome deficit for the plaintiff. Paintiff began to tape record his sessions with Ms. Styers, which was objectionable to her, prompting the filing of a motion prohibiting the same. Upon Order from the Industrial Commission for plaintiff to cease tape recording the sessions, plaintiff complied. Despite vocational efforts, plaintiff was unable to locate suitable employment.
24. As part of the vocational rehabilitation efforts, plaintiff attended simulated work activities at Cleveland Vocational Industries. Despite periods of pain and bouts of high blood pressure, plaintiff attended Cleveland Vocational Industries eleven of the fifteen scheduled days. On some days he had to leave early due to his back pain. For the eleven days he worked, the plaintiff earned $22.26, based on a piece rate of production. Plaintiff was motivated, compliant, and polite.
25. Polly Metcalf, vocational coordinator at Cleveland Vocational Industries, opined that if "plaintiff were to go out and get a job, based on what they observed, it would be difficult for him to maintain the job" and stated that the results of the evaluation at their center would indicate a poor prognosis for success if plaintiff were employed.
26. Based upon the most competent evidence of record, plaintiff is unable to earn wages at this time. Plaintiff's treating physician, Dr. McKean, has indicated that plaintiff is unable to work at this time due to both physical and mental issues.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. On February 2, 1995, the plaintiff suffered an admittedly compensable injury by accident, resulting in injury to his back and resulting in depression and emotional stressors. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has complied with vocational rehabilitation efforts and with prior Orders of the Industrial Commission regarding the same and should not have his compensation ceased for noncompliance. Plaintiff has not unjustifiably refused any suitable employment. N.C. Gen. Stat. §§97-18.1, 97-25, 97-32.
3. As a result of plaintiff's work-related physical and mental conditions, plaintiff is totally disabled, and is entitled to compensation at the rate of $371.08 per week until further Order of the Industrial Commission. N.C. Gen. Stat. § 97-29.
4. Plaintiff is entitled to reasonable and necessary nursing expenses, medicines, sick travel, medical, hospital and other treatment or course of rehabilitative or pain management services at defendants' expense reasonably required to effect a cure, provide relief and lessen the period of disability. Dr. McKean's treatment of the plaintiff was reasonably designed to tend to effect a cure, provide needed relief from or lessen the period of disability associated therewith, therefore defendants shall pay all reasonable and necessary medical expenses incurred by the plaintiff as a result of the injury by accident and related depression. N.C. Gen. Stat. §§ 97-25; 97-2(19).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Defendants shall pay plaintiff compensation for temporary total until further Order of the Industrial Commission, at the rate of $371.08.
2. Defendants shall pay all reasonable and necessary nursing expenses, medicines, sick travel, medical, hospital and other treatment or course of rehabilitative or pain management services, including the psychiatric treatment with Dr. McKean, at defendants' expense.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation due plaintiff under Paragraph 1 of this AWARD is approved for plaintiff's counsel and shall be paid as follows: twenty-five percent (25%) of the sum due plaintiff shall be deducted from that sum and paid directly to plaintiff's counsel, in the form of every fourth check due plaintiff, which shall be sent to plaintiff's counsel. Consideration and designation of this attorney's fee contemplates that counsel for the plaintiff shall continue and is ORDERED to monitor the submission of plaintiff's medical expenses.
4. Defendants shall pay the costs.
This the 17th day of February, 2004.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
 S/_____________ PAMELA T. YOUNG COMMISSIONER